**Jackie R. LOVETT, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: April 15, 1986.
Decided: Oct. 9, 1986.

Edward C. Gill, Robert C. Wolhar, Jr. & Associates, P.A., Georgetown, for appellant.

Gary A. Myers, Deputy Atty. Gen., Dept. of Justice, Georgetown, for appellee.

Before CHRISTIE, C.J., McNEILLY, HORSEY, MOORE and WALSH, JJ. constituting the Court en banc.

WALSH, Justice:

In this case the defendant-appellant, Jackie Ray Lovett, presses several grounds for reversal of his convictions of first degree murder and possessing a weapon during the commission of a felony. His primary argument is that the Superior Court should have suppressed certain incriminating statements he made to police because those statements were obtained in violation of his right to counsel under the Federal and Delaware constitutions. We begin with a chronological account of the facts underlying this claim.

I

On June 24, 1982, the bodies of Lori Todd and Richard Bull were found floating in a tributary of the Pocomoke River in Maryland. Autopsies revealed that each had died from a bullet wound to the head. A subsequent joint investigation by Maryland and Delaware State Police indicated that the victims may have been killed in Delaware and their bodies dumped in nearby Maryland.

On each of the next four days, police talked to Charles Bower, a relative of Lovett, about the murders. Bower initially denied any knowledge of them, but on June 28, gave police a statement in which he claimed he was in a farmhouse near Delmar, Delaware, when Lovett took both Todd and Bull in back of the farmhouse and murdered them. Also on June 28, Lovett, who had previous exposure to the criminal justice system,[1] learned that he might be wanted on a murder charge in Delaware and traveled to Philadelphia to consult an attorney in that city. The attorney was unable to represent Lovett, but testified at trial that he cautioned Lovett not to make any statements to anyone until after seeking the advice of an attorney, and to make sure he got an attorney. The attorney testified "But he knew what I was talking about and he said that he certainly wouldn't be foolish enough to make any statements to any police authorities until he had gotten the advice of an attorney." On July 6, 1982, a Sussex County grand jury indicted Lovett for murder in connection with the deaths of Todd and Bull. A warrant for his arrest was issued the next day.

On July 15, 1982, Maryland State Police arrested Lovett when officers stopped an automobile in which Lovett was a passenger. Lovett had dyed his hair but the arresting officers, who were aware that a fugitive warrant had been issued for Lovett, had been informed he would be inside. Lovett was transported to the Maryland State Police Barracks in Salisbury and placed in the custody of Officer Megee, who had been investigating the Todd-Bull murders. Megee advised Lovett of his *Miranda* rights, and Lovett signed a typewritten form waiving those rights. Lovett

---

also signed a typewritten form waiving his right of prompt presentment to a Maryland Commissioner, who would have advised Lovett of the charges against him, of his right to be represented by counsel, and other matters concerning bail, probable cause, and a preliminary hearing.

What happened next was disputed both in a suppression hearing before the Superior Court and at trial. At the suppression hearing Officer Megee gave the following account. He testified that he informed Lovett that first degree murder charges were pending against him, and that Lovett replied that "he knew what had happened." Megee then told Lovett that Charles Bower had been arrested in connection with the deaths of Todd and Bull and had implicated Lovett in both of them, at which point Lovett responded that "he could tell me exactly what happened; that Bowers [sic] was not as innocent as he proclaimed to be; and that Bower was, in fact, as guilty as he, Lovett, was. Again, he reiterated he could tell me exactly what happened on that particular night." Megee then told Lovett that he wished to obtain a statement from him, at which point Lovett asked whether it "would be any trouble to get an attorney." Construing Lovett's question as an invocation of his right to counsel, Megee ceased questioning Lovett. He attempted, without success, to telephone Lovett's attorney while Lovett "listen[ed] in at the phone as it rang to be sure that he understood that I was not trying to pull anything over on him and that, in fact, I couldn't get hold of his attorney." Megee did not resume discussion with Lovett about the murders, but instead completed the booking process, asking Lovett only routine booking questions such as his name, birthdate, and place of residence. He also prepared the application for a fugitive warrant to be presented to a Maryland commissioner. After completing this paperwork, he told Lovett "It's time to go now," at which point Lovett "spontaneously began talking about the murders of Gordon Gillis and Walter Scott that had occurred prior to the incident of Lori Todd

and Richard Bull." Megee testified that "Once Mr. Lovett started talking about the Gillis-Scott murder, he eventually continued with his conversation into the Todd-Bull murder." During this statement Megee asked questions such as "Well, what then happened?," or "Then what did you do?," but no direct questions such as "Did you do this?," or "Did you do that?" After Lovett had talked "close to an hour" he attempted to put Lovett's statement on tape. On the tape Lovett simply renewed his request for counsel and acknowledged that Megee had previously attempted to contact counsel for him.

Megee again ceased all discussion about the murders and again sought to contact Lovett's attorney, eventually reaching an associate in his firm. The associate arrived at the barracks shortly thereafter and, after consulting with Lovett, informed Megee that no statement would be taped.

Lovett testified at the suppression hearing and contradicted Megee's testimony. Apparently resolving factual disputes in favor of the State, the Superior Court refused to suppress Officer Megee's testimony concerning Lovett's statements.

At trial Officer Megee testified substantially as he did at the suppression hearing. His testimony included a statement that after Lovett signed forms waiving his Miranda rights and his right to prompt presentment, "I advised Mr. Lovett that there was a lot of discussion that had been done with reference to this incident and that I felt that he could tell me exactly what happened and Lovett at that point in time indicated that, yes, he could tell me what happened, that Bowers was as guilty as he was and that he could tell me basically what happened." Megee claimed that after he told Lovett that Bower had implicated him in the murders "His response was that Bowers was just as guilty as he was."

Megee's trial testimony essentially replicated his testimony at the suppression hearing as to Lovett's initial request for an

attorney, the unsuccessful attempt to contact Lovett's attorney, the subsequent completion of the routine booking process, and Lovett's lengthy spontaneous inculpatory statements concerning the murders of Gillis, Scott, Todd, and Bull following Megee's statement that it was time to leave. Lovett, on the other hand, testified at trial that he continuously requested an attorney during his conversations with Megee and that he never made incriminating statements to Megee. By its verdict the jury, inferentially at least, chose to disbelieve Lovett.

Lovett contends that the admission of these statements violated his right to counsel under the Sixth and Fourteenth Amendments. In *Deputy v. State*, Del.Supr., 500 A.2d 581, 589–90 (1985), we analyzed the accused's Sixth Amendment right to counsel under controlling decisional law and concluded:

> that, at a minimum, a defendant is entitled to legal representation 'at or after the time that adversary judicial proceedings have been initiated against him.' *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972).... This principle applies whether proceedings are commenced by way of a formal charge, preliminary hearing, indictment, information, or arraignment. *Id*..... Unlike the right-to-counsel situation discussed in *Miranda v. Arizona*, [384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] ... and other Fifth Amendment cases, the defendant's Sixth Amendment right to counsel is not dependent upon the defendant's request for

such counsel.... Instead, the latter right is activated by the initial judicial adversary proceeding and applies to *any* statements made by defendant, even if unsolicited....

■ Despite the atypicality of the indictment here, which preceded arrest, the language of both *Deputy* and *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964) [2] make it clear that Lovett's Sixth Amendment right to counsel attached when he was indicted in Delaware. Thus that right attached before he made any incriminating statements to Officer Megee.[3]

The question which necessarily follows is whether Lovett waived that right. *Deputy*, 500 A.2d at 590. Although Fifth Amendment as well as Sixth Amendment concerns are implicated in this case, because Lovett's statements were made while he was under arrest, in custody, and during his initial confrontation with police, Sixth Amendment waiver standards govern here. The State bears the burden of proving a waiver of both the Fifth Amendment right to counsel and the Sixth Amendment right to counsel. *Id.* at 591; *Wainwright v. State*, Del.Supr., 504 A.2d 1096, 1101 (1986). This Court has noted that waiver of a Sixth Amendment right to counsel is, if anything, a more difficult standard to satisfy than waiver of the Fifth Amendment right to counsel. *Deputy*, 500 A.2d at 591, n. 14; *Wainwright*, 504 A.2d at 1104. We have also noted that a waiver satisfying Sixth Amendment standards remains

**2.** In *Massiah* the Court held that "the petitioner was denied the basic protections of [the Sixth Amendment] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him *after he had been indicted* and in the absence of his counsel." 377 U.S. at 206, 84 S.Ct. at 1203 (emphasis added).

**3.** The State conceded before the Superior Court that Lovett's Sixth Amendment right to counsel attached through his indictment. In its brief before this Court, however, the State argues, citing *State v. Falcon*, Conn.Supr., 494 A.2d 1190, 1193–94 (1985) that "no such" right had

attached, because the indictment involved here was utilized solely to assist in Lovett's extradition. In *Falcon* the Court, citing extensive authority, held that extradition proceedings not involving the filing of formal charges do not implicate the Sixth Amendment. *Falcon* is inapposite here, as Lovett's indictment involved the filing of formal charges against him. The Court in *Falcon* explicitly recognized that its holding did not extend to cases involving the filing of formal charges. 494 A.2d at 1194, n. 7. Furthermore, cases involving indictments are clearly governed by *Massiah* and *Kirby*.

consistent with the Fifth Amendment if it involves "some form of affirmative overt action by the defendant which indicated his willingness to talk to law enforcement officers." *Deputy* at 591. For that reason we will focus on whether the State has shown that Lovett waived his Sixth Amendment right to counsel and took such affirmative overt action.

Waiver of the Sixth Amendment right to counsel is stringently reviewed by the courts. *Deputy* at 590. The State must prove "an intentional relinquishment or abandonment of a known right or privilege." *Id.* The State's burden is a heavy one, and courts will indulge in all reasonable presumptions against a finding of waiver. *Id.* Whether there has been a waiver "depends upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Oregon v. Bradshaw*, 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983).

In *Deputy* we articulated a three pronged standard for waiver of a Sixth Amendment right to counsel. The State must show "(1) that the defendant comprehended the nature of the right which he was forfeiting; (2) that defendant either by his own words or conduct, indicated an affirmative desire to relinquish these rights; (3) and that he did so voluntarily." 500 A.2d at 591. Considering the circumstances of this case, including Lovett's background, experience, and conduct, we conclude that the State met its burden in all respects as to both sets of Lovett's statements.

■ To begin with, Lovett's background, experience, and conduct strongly suggest he fully comprehended his right to counsel. He was no novice in the ways of the criminal justice system, having pled guilty to theft in 1971 and to two counts of distributing illegal drugs in 1977. He was sophisticated enough to consult an attorney concerning the murder charge against him well before he was indicted on that charge.[4] He received legal advice and professed to understand it. In their initial contact with Lovett, the police fully complied with *Miranda*. Lovett had been fully advised of his right to counsel. He had been read a prompt presentment form, which informed him that he had a right to counsel at any questioning and could be taken, as soon as possible, to a commissioner who would appoint counsel for him. Megee testified that Lovett indicated he understood both of those rights. Indeed, Lovett signed written forms which reflected that he had been advised of and understood both those rights. Viewing this factual evidence in a light supporting the Superior Court's factual conclusions, as we must on review, this evidence is sufficient to establish that Lovett comprehended his right to counsel.

■ There is ample evidence in the record that Lovett indicated an affirmative desire to relinquish that right when he made his first set of incriminating statements *i.e.*, that he knew what had happened, and that Bower was as guilty as he was. Although fully knowledgeable of his rights under *Miranda* and his right of prompt presentment, he had chosen to sign written forms explicitly waiving those rights. He was almost certainly aware he did not have to make these statements, yet did so in response to information subsequently provided by Officer Megee. In light of Lovett's sophistication and knowledge, the execution of these signed waiver forms and these affirmative responses establish sufficient "overt action by the defendant which indicated his willingness to talk to law enforcement officers" to satisfy both the Fifth Amendment and the second prong of the Sixth Amendment standard articulated in *Deputy*. 500 A.2d at 591.

■ Finally, the record shows that this waiver was voluntary, not coerced.

---

4. As noted earlier, Lovett consulted the attorney on June 28, 1982, but was not indicted until July 6, 1982.

All indications are that Lovett spoke of his own accord. The record contains no evidence of threats, promises, or inducements made to persuade Lovett to speak, *See Oregon v. Bradshaw*, 462 U.S. at 1046, 103 S.Ct. at 2835, or that Officer Megee used any deception, chicanery, or physical or psychological coercion. *See United States v. Gaynor*, 2d Cir., 472 F.2d 899, 900 (1973). Megee's statements concerning the charges against Lovett and the fact that Bower had implicated him in the murders came only after Lovett had already signed written forms waiving his constitutional rights, and hence cannot be deemed attempts to coerce such a waiver. Accordingly, the final prong of *Deputy* has been met as to these statements, and the admission of these statements in evidence did not violate Lovett's Fifth or Sixth Amendment rights.

■ The State has also met all three aspects of the *Deputy* standard and shown "overt affirmative action" as to Lovett's second, lengthy statement. The initial "cognition" prong of *Deputy* is established by the same evidence that establishes it as to his first set of statements, and by the fact that Lovett was present during Megee's intervening attempts to contact his attorney. The evidence establishing overt, affirmative action indicating a desire to waive is even stronger concerning this statement than it is concerning his earlier ones. If the evidence is to be believed, this statement was spontaneous. It was made not in response to police interrogation, but to Megee's statement "It's time to go now." Nothing in the record suggests that Megee's intent in making that ostensibly innocuous statement was to "deliberately elicit" an incriminating response in violation of *Massiah*, or that the statement by itself was reasonably likely to elicit an incriminating response.[5]

The record also establishes that Lovett's second statement was voluntary. It contains no evidence of any physical or psychological coercion between Lovett's first and second statements. *See United States v. Gaynor*, 472 F.2d at 900. To the contrary, when Lovett requested the presence of counsel after making his first statement, Megee did not merely cease questioning Lovett, he made attempts to contact Lovett's attorney. There is no evidence that Megee made any threats, promises, or inducements to persuade Lovett to make his final statement. *See Oregon v. Bradshaw*, 462 U.S. at 1046, 103 S.Ct. at 2835. Accordingly, we conclude that the State has met its burden on the "voluntariness" prong of *Deputy* as to this statement.

The timing of Lovett's second statement raises the question of initiation, since the Supreme Court has held that the Fifth Amendment rule of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), applies when a defendant invokes his Sixth Amendment right to counsel, stating that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's rights to counsel for that police-initiated interrogation is invalid." *Michigan v. Jackson*, —— U.S. ——, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631 (1986).

■ No mechanical definition exists of what constitutes post-invocation "initiation" of discussions for purposes of the *Edwards* rule as later applied in *Oregon v. Bradshaw*. But any ambiguity about the precise definition of "initiation" under *Edwards* and *Bradshaw* is of no import here. Lovett initiated all post-invocation discussions about the murders of Todd and Bull under any reasonable definition of "initiation." Officer Megee's post-invocation communications to Lovett were confined to routine booking questions or attempts to

---

**5.** The fact that Megee earlier went "beyond the formalities of the booking process to describe the State's evidence, particularly the highly incriminatory accusations of" Bower, cannot be deemed a "tactic which was reasonably calculated to elicit a reaction from the defendant" in violation of *Massiah*, as he did so only after Lovett had signed ostensibly valid forms waiving his right to counsel. *Compare Wainwright*, 504 A.2d at 1102–1103.

implement Lovett's request for an attorney.

■ On the other hand, Lovett's spontaneous discussion of the murders of Gillis, Scott, Todd, and Bull constituted "initiation" by an accused and could reasonably have been interpreted by Megee "as relating generally to the investigation." *Oregon v. Bradshaw,* 462 U.S. at 1045–1046, 103 S.Ct. at 2935.[6]

■ The State has met the burden imposed on it by the standards of *Deputy* as to all of Lovett's statements involved here. It has also shown that these statements resulted from overt affirmative action on Lovett's part indicating a desire to waive his constitutional rights. Accordingly, we conclude that the admission of Megee's testimony concerning these statements did not violate Lovett's Fifth or Sixth Amendment right to counsel. We have not in the past construed Art. I § 7 of the Delaware Constitution as affording defendants greater rights than the federal constitution. We conclude here that Lovett's right to counsel under the Delaware Constitution was not violated.

## II

The facts underlying Lovett's second claim are undisputed. Shortly after Lo-

vett's arraignment, his counsel presented the prosecution with a request for a bill of particulars. Request "B" asked the prosecutor to describe "In what manner did defendant allegedly cause the death of Laurie Jean Todd." Request "H" contained questions pertaining to possible theories of secondary liability.[7]

To request B the State responded "B. Shot her in the head with a .22 caliber pistol" and to request H, "Lovett actually killed Lori Todd as far as the State knows at this time." The State never formally amended these responses.

At trial the jury heard two versions of the death of Lori Todd. The first was presented by Charles Bower, who testified that Lovett personally shot both Bull and Todd. The second was presented by Officer Megee. Megee testified that in his post-arrest statement of July 15, 1982, Lovett admitted shooting Bull, but claimed that shortly thereafter Bower had killed Todd in an unrelated incident.

In its instructions to the jury at the close of trial, the Superior Court included an instruction indicating that the jury could find Lovett guilty of first degree murder as an accomplice if another person actually killed Lori Todd.[8]

---

6. To a degree, the facts of this case resemble those of *Wainwright,* where we held that the police officer initiated discussions about the crimes involved there. In both cases the police officer handling the booking informed the accused that another arrestee had implicated him in a murder. In both cases the accused made spontaneous incriminating statements after a significant delay. The distinguishing factor here is that Officer Megee made no such prompting statements *after invocation.* Thus Megee's earlier, pre-invocation statements are irrelevant for determining whether he initiated post-invocation interrogation here.

7. In relevant part these questions read:

H. State whether it is defendant's act or the act of another which allegedly caused the death of Lori Jean Todd, and if it is the act of another state:

 1. The name of the person or persons, ...

 \* \* \* \* \* \*

 3. Whether defendant caused an innocent or irresponsible person to engage in conduct constituting the offense,

 4. Whether defendant solicited, requested, commanded, importuned, or otherwise attempted to cause the other person to commit the offense,

 5. Whether defendant aided, counseled, agreed or attempted to aid the other person in planning or committing the offense, and

 6. Whether defendant had a legal duty to prevent the commission of the offense and failed to make a proper effort to do so.

8. The instruction reads as follows:

With respect to the charge of murder in the first degree, the State contends that if another person committed the offense, the defendant is, nevertheless, guilty as an accomplice. The pertinent section of our Criminal Code reads as follows:

A person is guilty of an offense committed by another person when, intending to promote or

Lovett contends that the giving of this instruction was reversible error in two respects. First, he argues that there is insufficient evidence in the record to support the giving of an accomplice instruction, since the jury was exposed only to Bower's testimony that Lovett personally killed both Todd and Bull and Lovett's statement that he was completely uninvolved in Todd's death. Secondly, he argues that the instruction unlawfully allowed the State to proceed beyond the limits of its bill of particulars which, he contends, restricted it to proving that Lovett personally shot both Todd and Bull.

The general rule in Delaware is that a defendant indicted as a principal may be convicted as an accomplice. 11 *Del.C.* § 275. Lovett maintains, however, that the statutory rule does not apply where there is insufficient evidence to permit the giving of an accomplice instruction and where the State, through a bill of particulars, has disavowed an accomplice theory.

 Lovett essentially makes an "all or nothing" evidence argument, that the jury was required either to wholly believe or wholly discredit the versions of Bower and Lovett. We reject this argument. The jury is entitled to believe some but not all of a witness' testimony. *Belton v. United States*, D.C.Cir., 382 F.2d 150, 155 (1967). *Carothers v. Rhay*, 9th Cir., 594 F.2d 225, 229 (1979); *United States v. Cueto*, 10th Cir., 628 F.2d 1273, 1275 (1980). It is entitled to believe one witness as to part of his testimony, and a different witness on other points in dispute. *Belton*, 382 F.2d at 155. Therefore, as here, when one witness testifies that the defendant personally shot two victims, and the defendant presents an alibi defense, the jury is not required to conclude that the defendant was either a principal or a complete nonparticipant. It may conclude that he was a nonprincipal participant, *i.e.* an accomplice. *Carothers v. Rhay*, 594 F.2d at 229.

Here the jury was entitled to believe Lovett's statement that he did not personally kill Lori Todd, yet disbelieve his statement that he played no part in her death, or that her death was completely unrelated to the death of Bull. It was entitled to believe that Bower truthfully indicated that Lovett was involved in Todd's death, but that Bower significantly underplayed his own role in both murders. Accordingly, the jury in this case was entitled to conclude, based on the evidence presented at trial, that Lovett was an accomplice in the murder of Lori Todd.

Nor is the State's accomplice theory foreclosed by its bill of particulars. A bill of particulars generally confines the prosecution's proof to the particulars supplied. *United States v. Glaze*, 2d Cir., 313 F.2d 757, 759 (1963). However, its purpose is not to "freeze" the State's case in advance of trial, as Del.Super.Ct.Crim. Rule 7(f) recognizes.[9] *See also United States v. Rivero*, 5th Cir., 532 F.2d 450, 457 (1976).

---

facilitate the commission of the offense, he aids, counsels, or agrees or attempts to aid the other person in planning or committing it. [*See* 11 *Del.C.* § 271]

So, in order to find a defendant guilty of an offense committed by another person, you must find that all three of the following requirements of this section have been established beyond a reasonable doubt:

First, another person committed the offense charged, namely, murder in the first degree, as I have explained it to you;

Second, that the defendant aided, counseled, or agreed or attempted to aid the other person in planning or committing the offense; and,

Third, that the defendant intended to promote or facilitate the commission of the offense. In other words, it was his conscious object or purpose to further or assist the commission of the offense.

Mere presence at the scene of a crime, without proof of those three elements that I have outlined for you, does not support a finding of guilty under this section. You may find the defendant guilty of the killing committed by another person only if you are satisfied beyond a reasonable doubt that the killing was within the scope of the agreed activity or was reasonably to be expected as an incident to that activity.

**9.** This rule provides that a bill of particulars may be amended at any time subject to such conditions as justice requires.

Essentially, a bill of particulars is intended to provide notice supplemental to information contained in the indictment. It also serves to protect the defendant against surprise during the trial, and to preclude a second prosecution for an inadequately described offense. *United States v. Cantu,* 5th Cir., 557 F.2d 1173, 1178 (1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978); *United States v. Addonizio,* 3d Cir., 451 F.2d 49, 63–64, *cert. denied,* 405 U.S. 936, 1048, 92 S.Ct. 949, 1309, 30 L.Ed.2d 812 (1972). *Compare Malloy v. State,* Del.Supr., 462 A.2d 1088, 1092 (1983).

In considering a claim of variation from a bill of particulars, a court must therefore balance the need to avoid compelling the prosecution to freeze its case in advance of trial against the need to protect a defendant from unfair surprise. *United States v. Boffa,* D.Del., 513 F.Supp. 444, 485 (1980). Performing this balance, a number of courts have recognized that the prosecution need not disclose in a bill of particulars the precise details a defendant and an alleged coconspirator played in a conspiracy. *United States v. Boffa,* D.Del., 513 F.Supp. 444, 485 (1980). The prosecution need not specify which defendants are charged as principals and which are charged as aiders and abbetors. *United States v. Mannino,* S.D.N.Y., 480 F.Supp. 1182, 1185 (1979); *United States v. Bozza,* E.D.N.Y., 234 F.Supp. 15, 16 (1964). It need not specify how it will attempt to prove the crimes charged, or the precise manner in which the crimes alleged in the indictment were committed. *United States v. Leonelli,* S.D.N.Y., 428 F.Supp. 880, 882 (1977). While these cases may be viewed as involving disclosure demands, not variation claims, the rationale—the need to avoid compelling the prosecution to freeze its case before trial—is applicable in both contexts.

Several courts performing this balance have reasoned that an alleged deviation from a bill of particulars actually supplied does not justify reversal of a conviction unless the deviation prejudices the defendant's preparation of his case. *United States v. Rivero,* 5th Cir., 532 F.2d 450, 457 (1976); *United States v. Glaze,* 2d Cir., 313 F.2d 757, 759–60 (1963). This is similar to the rule that a defective indictment does not justify dismissal unless the defect prejudices the defendant's preparation of his case. *State v. Getty Oil Company (Eastern Operations) Inc.,* Del.Super., 305 A.2d 327, 332 (1973); *Keller v. State,* Del.Supr., 425 A.2d 152, 155 (1981).

In light of these principles, we conclude that although the State's bill of particulars mentioned only principal liability, Lovett was sufficiently put on notice prior to trial that he could be found guilty as an accomplice, and hence that the bill of particulars did not limit the State to proving that Lovett personally killed both Todd and Bull. Bower's testimony and Lovett's pretrial statements sufficed to support a finding that Lovett was guilty as an accomplice. Defense counsel was aware of the substance of Lovett's statements and Bower's prospective testimony in time to adequately defend against them. He knew in advance that the jury would hear both versions at trial. Consequently, defense counsel was put on notice, by the substance of Lovett's and Bower's pretrial statements, that Lovett could be found guilty as an accomplice.

Since these statements sufficed to put Lovett on notice, we must reject his contention that the State's bill of particulars caused him prejudice or unfair surprise. The bill of particulars did not negate such notice. Any surprise, foregone investigation, or foregone questioning resulted from defense counsel's erroneous "all or nothing" interpretation of the law, not from the bill of particulars. Under these circumstances, the court's accomplice liability instruction was merely "the equivalent of allowing the bill of particulars to conform to evidence, [which in this case defense counsel knew would be presented at trial,] of a weight permitting the jury to credit it beyond a reasonable doubt." *United*

*States v. Rivero,* 532 F.2d at 457. Furthermore, the record does not establish that the jury convicted Lovett as an accomplice rather than a principal. It may well be that it wholly ignored the Court's accomplice liability instruction.

■ Finally, there was an additional policy reason for giving the accomplice liability instruction based on the evidence presented at trial in this case. The accomplice instruction could reasonably have helped prevent the jury from erroneously concluding that Bower's involvement in one or both of the murders necessarily raised a reasonable doubt as to Lovett's guilt. *State v. Caouette,* Me.Supr., 462 A.2d 1171, 1175 (1983). Under these circumstances, the evidence presented at trial clearly justified the Superior Court's accomplice liability instruction.

### III

Lovett's third claim on appeal arises from the State's efforts to depict Lovett's post-arrest conduct as evidence of his guilt. He claims the Superior Court committed reversible error in (a) admitting evidence concerning post-arrest threats Lovett made against the life of Charles Bower, (b) not granting a mistrial or giving a curative instruction at the close of the State's case because the prosecutor mentioned threats against law enforcement officials in his opening statement but failed to produce evidence of such threats, and (c) not granting a mistrial based on the prosecutor's claim, in his rebuttal summation, that Lovett had placed a liar in the State's case. Each of these assertions will be separately considered.

### A.

In his opening statement, the prosecutor stated: "We will bring witnesses in to testify to you that even after he was caught Jackie Lovett, while he was in prison, tried to arrange the murder of several law enforcement officers and Chuck Bower...."

At trial, the State produced both testimony and a letter indicating that in November, 1983, while imprisoned in Smyrna, Delaware, Lovett tried to arrange the murder of Bower. Gary Connelly, at the time a cook at a second prison in Delaware, where Bower was also imprisoned, testified that upon visiting Lovett's prison for a parole hearing, he encountered Lovett, who asked him to place poison in Bower's prison food. Through Connelly, the prosecution introduced a letter written in Lovett's handwriting and signed "Half-a-Nickel, Jack," which Connelly later received at his prison. The letter began "Hello Gary ... I have not been able to hook up on plan A yet. You should know what I mean." The letter contained a postscript which stated "Plan A is shaky. We need a solid foundation under us, my man." Connelly testified that "Plan A" referred to Lovett's plan to have poison placed in Bower's prison food.

■ Lovett contends that evidence concerning his plan to kill Charles Bower was irrelevant and admitted in violation of D.R.E. 404(b), which prohibits the admission of other crimes or bad acts to prove character. The State counters that a defendant's attempts, during a pending prosecution, to influence the testimony of a witness, *e.g.* by trying to harm or kill him, suggests a consciousness of guilt, from which actual guilt of the crime charged can be inferred. We conclude that evidence of Lovett's plan to kill Bower was relevant to Lovett's consciousness of guilt for the murders of Todd and Bull, and hence that the admission of this evidence did not violate D.R.E. 404(b).

D.R.E. 404(b), like its federal counterpart, excludes evidence of other crimes or wrongful acts used to show a person's character, but admits such evidence for other purposes, such as consciousness of guilt. A defendant's efforts, during a pending prosecution, to influence or alter the testimony of a prospective witness is relevant to the issue of consciousness of guilt. *Goldsmith v. State,* Del.Supr., 405 A.2d 109, 114 (1979). A defendant's solici-

tation to harm or kill prospective government witnesses is therefore relevant to that issue. *United States v. Papia*, 7th Cir., 560 F.2d 827, 848 (1977); as are a defendant's direct threats on a prospective government witness. *United States v. Rosa*, 1st Cir., 705 F.2d 1375, 1377 (1983). Here the Superior Court specifically instructed the jury that such evidence was admissible only to prove Lovett's consciousness of guilt. *Goldsmith v. State*, 405 A.2d at 114. Consequently we find such evidence relevant to its intended use.

■ Lovett also contends that the admission of this evidence was unduly prejudicial. We reject this contention. Although "the potentional prejudice from death threats may be great" *United States v. Gonzalez*, 11th Cir., 703 F.2d 1222, 1223 (1983), in large part because of their inflammatory nature, here Lovett was already on trial for crimes more heinous than his alleged plan to kill Charles Bower. The evidence of this plan was, if anything, less inflammatory than evidence concerning the crimes with which he was charged. The jury was not sidetracked into a separate trial as to whether events relating to the plan actually occurred, because Lovett admitted writing the letter to Connelly and admitted that Plan A was to put mercury into Bower's drink. The Superior Court mitigated any prejudice to Lovett by specifically instructing the jury that evidence of the plan could be used only to show that Lovett had a guilty mind. Under these circumstances, we decline to find this evidence unduly prejudicial.

### B.

■ Despite the claim made by the prosecutor in his opening statement, the State produced no evidence at trial that Lovett tried to arrange the murder of any law enforcement officials. Based on this lack of proof, at the end of the State's case Lovett moved for a mistrial or, in the alternative, an immediate curative instruction. The court denied both motions but did give a curative instruction as part of its general charge.[10] On appeal, Lovett contends that the Superior Court committed reversible error in not granting a mistrial based on this lack of proof or in failing to give an immediate curative instruction.

An opening statement of a prosecutor will not be a basis for reversal unless it is established that the prosecutor acted in bad faith or actual prejudice resulted. *McCarthy v. State*, Del.Supr., 372 A.2d 180, 185 (1977). The State contends that the prosecutor's statement was based on a good faith belief that it would be supported by the testimony of James Magrogan (who subsequently recanted earlier statements he made to police), and Lovett concedes that there is no evidence of explicit bad faith on the part of the prosecution. Hence the issue here is whether the reference to such threats created actual prejudice. The Superior Court in this case gave an emphatic limiting instruction specifically informing the jury to disregard the prosecutor's comment and not give it any weight or concern. We are satisfied that this curative action effectively guided the jury in limiting its consideration to the evidence introduced at trial and thus find no basis for error. *Frazier v. Cupp*, 394 U.S. 731, 736, 89 S.Ct. 1420, 1423, 22 L.Ed.2d 684 (1969).

### C.

Lovett contends that the Superior Court committed reversible error when it refused to grant a mistrial based on a statement the prosecutor made in his rebuttal summa-

---

**10.** The instruction read:

> The prosecutor in this case, in his opening argument, stated that as part of this case, he would produce evidence of threats by the defendant on law-enforcement officials. The Court now instructs you that there has not been any evidence of such threats by the defendant shown by the prosecution, and that, therefore,

> you should completely disregard the prosecutor's comments on this matter and not give them any weight or concern in your deliberations. You should not draw any inference from this instruction as to the weight or credibility to be given to any other evidence or argument in this case, since you are the exclusive judges of those matters.

tion. To understand this contention, it is necessary to recount the trial testimony of James Magrogan and Detective Griffith and the closing arguments preceding the prosecutor's rebuttal summation.

At trial the prosecution called Magrogan, who testified on direct that he and Lovett had discussed Lovett's murder prosecution while both were in prison in March, 1983. Magrogan testified that Lovett had told him that he (Lovett) had not been present at the murders of Todd and Bull. He subsequently admitted that he had previously told the prosecutor the opposite, that Lovett had told him he (Lovett) *had* been present at those murders. Simply put, Magrogan, although called by the prosecution, offered testimony tending to exculpate Lovett, but admitted making a contradictory statement to the prosecutor earlier.

To rebut Magrogan's exculpatory testimony, the State produced Detective Griffith of the Delaware State Police. Detective Griffith testified that Magrogan had given him information about the deaths of Todd and Bull, that Magrogan had said the source of his information was Jack Lovett, that Magrogan knew facts only someone who had been at the murders of Todd and Bull would know, and that approximately eight months prior to trial he (Griffith) had moved Magrogan from his place of incarceration in Maryland to a place of incarceration in Delaware pursuant to the interstate witness agreement. 11 *Del.C.* § 3523. In closing arguments, neither the State nor the prosecution mentioned Magrogan's testimony.

In his rebuttal summation, however, the prosecutor stated:

> Jack Lovett placed in the midst of the State a liar: James Magrogan ... Detective Griffith told you that one person told him enough information that he believed him and that was James Magrogan. There is only one source of James Magrogan's information to get inside of the State's case and that is Jack Lovett. Jack Lovett manipulated me.

Lovett contends that the Superior Court erred in not granting a mistrial based on this statement because no evidence introduced at trial supported it and because defense counsel had no opportunity to respond to it.

■ We reject Lovett's contention that the jury could not reasonably infer, based on the evidence presented at trial, that Lovett had something to do with Magrogan's testimony. The jury knew that Magrogan had been called as a prosecution witness, and that the prosecution had arranged for him to testify. Since the State was surprised by Magrogan's testimony it was entitled to provide an explanation for it. Magrogan admitted to having pretrial contact with Lovett and having discussed with him the murders of Gillis, Scott, Todd and Bull. Based on this knowledge, the jury could reasonably infer that Lovett had a hand in Magrogan's exculpatory testimony.

■ We do not share Lovett's contention that this case is governed by *Bailey v. State*, Del.Supr., 440 A.2d 997 (1982). In *Bailey* we held that the trial court committed reversible error in allowing the prosecutor to reserve the bulk of his concluding arguments for his rebuttal summation. In *Bailey* the prosecutor's entire opening summation lasted only five minutes, and made only one passing reference to the testimony of a witness, whereas his rebuttal lasted over an hour and discussed the testimony of numerous witnesses not mentioned by the defense in its summation or the State in its opening summation. The prosecutor's one comment at issue here does not bring this case within the scope of *Bailey*. Viewed in the context of Lovett's lengthy trial, we conclude that this comment did not affect the fairness of his trial.

## IV

Lovett next argues that the Superior Court committed reversible error in refusing to allow defense counsel, on cross-examination of Charles Bower, to elicit testimony that the prosecutor had moved for

the admission pro hac vice[11] of Bower's attorney at a Superior Court proceeding.

Charles Bower, who on June 28, 1982, and September 14, 1982, had given police statements implicating Lovett in the murders of Todd and Bull, testified for the State at trial. When Bower entered guilty pleas admitting his role in these crimes, his attorney, a member of the Maryland Bar, was not licensed to practice in Delaware, but was admitted pro hac vice upon motion by the prosecutor.

Although Bower denied that any deals existed between himself or between his attorney and the prosecution at the time he testified or made his earlier statements to police, defense counsel sought to show that Bower's testimony was biased because either he or his attorney was colluding with the prosecution. To that end, defense counsel secured a number of admissions from Bower. He elicited testimony that Bower had participated in two homocides, but had been permitted to plead guilty to manslaughter and a weapons charge rather than first or second degree murder; that he was facing a range of sentences from five to ninety years, but had not yet been sentenced; and that before the trial Bower and the prosecutor had discussed both a transcript of a taped statement Bower had made to the police and Bower's upcoming trial testimony.[12]

Bower also testified that his attorney was present when Bower gave his September 14 statement to the police, and had frequently urged Bower, in the presence of the prosecutor, to be completely truthful with the prosecutor rather than "act like a choir boy" or attempt to portray himself in a falsely beneficial light. He admitted that some of the information he gave the prosecutor which later proved useful in convicting Lovett was given upon advice of his attorney.

Asserting that his purpose was to show that the two attorneys "were in some sort of collusion," defense counsel sought to question Bower concerning the admission of his counsel pro hac vice upon the motion of the prosecutor. The Trial Judge refused to allow him to elicit such testimony. On appeal Lovett contends that this refusal violated his due process and confrontation rights.

This claim is clearly without merit. When, as here, the rejected cross-examination relates to impeachment evidence, the test for determining whether a trial judge's limitation on cross-examination violates a defendant's confrontation right is whether the ruling permits sufficient cross-examination to (1) allow the jury to be exposed to facts sufficient for it to draw inferences as to the reliability of the witness, and (2) allow defense counsel an adequate record from which to argue why the witness might have been biased. *Weber v. State*, Del.Supr., 457 A.2d 674, 682 (1983). As outlined above, defense counsel in this case forcefully elicited from Bower on cross-examination a number of admissions tending to show that Bower's testimony might be biased. These admissions allowed exposure to the jury of facts sufficient for it to draw inferences concerning Bower's reliability, and for defense counsel to argue that Bower was biased. Indeed, given the number and damaging nature of these concessions, a further concession that the prosecutor had moved for the admission of his attorney pro hac vice was peripheral at best and clearly cumulative.

Moreover, the admission of counsel pro hac vice is a matter of local custom and court rule. In itself, it carries no implication of connivance or collusion and is a matter addressed to the discretion of the trial judge. It has no evidentiary significance under the circumstances of this case. The Superior Court's ruling did not violate Lovett's due process or confrontation clause rights.

---

**11.** For this one particular occasion.

**12.** Bower testified that he had told the prosecutor that "anything I had to say I would say from my mind," rather than from his statement.

## V

Lovett contends that the Superior Court's denial of his requests for discovery of police reports and an interview with Detective Griffith violated his due process rights.

Prior to trial, Lovett's counsel attempted to interview Detective Griffith, the State's chief investigator, but Griffith was instructed by the prosecutor not to discuss the case with defense counsel. Defense counsel responded to this refusal by filing a motion to require the State to turn over all police reports and other investigative reports in its possession relevant to the case, alleging that "the tainting of Detective Griffith by the improper conduct of the prosecutor in this case has made the remedy of a simple interview with Detective Griffith now unacceptable to the defense." In the alternative, the motion requested an order compelling Detective Griffith to submit to an interview. The Trial Judge denied both requests.

The State had complied with earlier discovery requests by Lovett himself and his previous attorneys, and had produced statements of the codefendant and other witnesses, as well as autopsy and scientific reports. Detective Griffith was not a direct witness to the alleged crimes.

■ The prosecution has the duty under the due process clause to insure that criminal trials are fair by disclosing evidence favorable to the defendant upon request. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, "there is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977). In addition, there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois*, 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972). Since a major portion of police investigatory work is contained in police reports, a defendant has no

due process right to discovery of police reports made in the course of criminal investigations. *State v. Thompson*, Del.Super., 134 A.2d 266, 267–268 (1957).

Indeed, it is settled law in Delaware that a defendant cannot compel discovery of a police officer's notes which reflect that officer's recollection of a conversation with the defendant or a third person, *Smith v. State*, Del.Supr., 317 A.2d 20, 22 (1974) or of police investigatory reports. Super.Ct. Crim.R. 16(b); *State v. Winsett*, Del.Super., 200 A.2d 237, 238 (1964). These holdings are consistent with the general rule of criminal procedure concerning discovery of police reports. *See* Torcia, *Wharton's Criminal Procedure*, § 381 at 397 nn. 46, 47 (1975).

■ Lovett contends that the prosecutor's refusal to permit an interview of Detective Griffith violated his due process rights by interfering with his right of access to a prospective witness. However, Lovett's counsel was not seeking to obtain information within Detective Griffith's personal knowledge. His initial letter to Detective Griffith requested an interview specifically to discuss "your investigation, witness statements obtained, and anything else relevant to this matter." His other letters also asked to discuss Detective Griffith's investigation. The thrust of these letters was to request oral discovery of information gleaned through investigation and normally incorporated in written police reports. Such information is not discoverable in written form, *supra*, and does not become discoverable merely because a defendant requests that it be given through interview. To hold otherwise would be to permit circumvention of settled discovery limitations in criminal cases.

This is not a situation in which a defendant seeks access to information within a prospective witness' personal knowledge. *Compare Wisniewski v. State*, Del.Supr., 138 A.2d 333, 338 (1957); *State v. McDevitt*, Del.Super., 297 A.2d 58, 60 (1972). That situation is not before us, and we

therefore do not address it. We merely hold that the prosecutor did not violate Lovett's due process rights by preventing oral discovery of information that would not be discoverable in written form.

Moreover, to succeed on a due process claim based on the government's making a witness unavailable for an interview, a defendant must show that the unavailability prevented him from securing a fair trial. *United States v. Valenzuela-Bernal,* 458 U.S. 858, 872–873, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982). Specifically, although he need not "render a detailed description of [the] lost testimony," he must make a plausible showing that he was denied testimony which would have been material and favorable to his defense and not merely cumulative to the testimony of available witnesses. *Id.*

■ Lovett has not met this standard. He has made no plausible showing that Detective Griffith's unavailability caused the loss of evidence material and favorable to his case. Defense counsel's justification for seeking the interview was that while Lovett's crimes were alleged to have been committed on June 19, 1982, he was not appointed until August 1984, and the passage of that time limited counsel's ability to reconstruct the events of June 1982. However, it appears from the record that Lovett had been represented by prior attorneys generally from October, 1982 to May, 1984, and there is no suggestion that Lovett's prior attorneys conducted inadequate investigations. Accordingly, we hold that the Superior Court's ruling did not deprive Lovett of his due process right to adequate trial preparation.

### VI

Lovett claims another discovery violation arising out of a "Motion for Disclosure of Impeaching Information" filed by his counsel on October 27, 1982. This motion, invoking Superior Court Criminal Rule 16 and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) requested information in four areas.

1. Prior felony convictions, guilty verdicts, and juvenile adjudications attributed to each witness called by the state, but not limited to "rap sheets."

2. Records revealing prior misconduct or bad acts of each such witness, such as arrests or police "contact reports."

3. Any consideration or promises of consideration given to or expected by each such witness, such as plea bargains, or anything else which could reveal an interest, bias, or motive in the witness in favor of the State.

4. Threats, coercion, criminal prosecutions, investigations, or potential prosecutions pending or which could be brought against any such witness, probationary, parole, or custodial status of the witness, and pending or potential legal disputes or transactions with the State or over which the State has influence.

The Superior Court granted requests numbers 3 and 4 in toto. It granted requests number 1 and 2 only as to witnesses' prior felony records, known "bad acts" admissible under D.R.E. 608(b), and misdemeanor convictions involving dishonesty or false statements. It required the State to disclose this information at the beginning of the jury selection process. The court limited these grants by stating "The required disclosure just enunciated will not extend to police officers or witnesses testifying as experts or as to matters such as procedure."

■ Lovett voices a general objection to this ruling. His sole contention, apparently referring to his right of cross-examination under the confrontation clause, is that the Superior Court's order constituted "an implied ruling that the defendant would not be able to impeach the witnesses set forth in the exception." We disagree. The Superior Court's ruling imposed no direct restraint on cross-examination itself. Defense counsel remained free to conduct relevant cross-examination on any permissi-

ble topics, including past crimes and admissible bad acts. The Superior Court merely refused to order the State to turn over materials to implement such cross-examination. This ruling can hardly be viewed as a violation of the right to cross-examination under the confrontation clause. *See United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985).

As noted above, Lovett's motion was premised on *Brady* and Superior Court Criminal Rule 16. Under *Brady* a defendant has a due process right to discovery of material in the State's possession that is material to guilt or punishment and favorable to the accused. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Boyer v. State,* Del.Supr., 436 A.2d 1118, 1126 (1981). Impeachment evidence as well as exculpatory evidence falls within the scope of the *Brady* rule. *United States v. Bagley,* 105 S.Ct. at 3380. However, suppression of *Brady* material "amounts to a constitutional violation only if it deprives a defendant of a fair trial." *Id.* at 3381. Reversal of a conviction is justified only if evidence is suppressed which "is material in the sense that its suppression undermines confidence in the outcome of the trial." *Id.* The defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 3384.

■ Whether or not the Superior Court's ruling was correct under *Brady,* Lovett has provided this Court with no basis for finding such a reasonable probability here. He was not, as he contends, foreclosed from impeaching witnesses who fell within the exception. Furthermore, he never attempted to subpoena the relevant records pertaining to those witnesses. He has offered only speculation that the type of impeachment evidence he requested actually exists for any of those witnesses. Such speculation does not amount to a reasonable probability that absent the Superior Court's limitation his trial would have

yielded a different result. Hence we conclude that he has not satisfied the test for reversal.

■ Superior Court Criminal Rule 16(b) authorizes a defendant to request discovery of "designated ... documents ... which are in the possession, custody, or control of the State, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable." Rule 16 does not provide for pretrial discovery of *Brady* material, as Lovett sought here. *State v. Traenkner,* Del.Super., 314 A.2d 202, 207 (1973). Furthermore, Rule 16 is of narrow scope directed primarily to statements by defendants or codefendants and to results obtained through scientific tests or medical examinations. Clearly the rule does not encompass the information denied production by the Superior Court.

## VII

Lovett's counsel filed a post-trial motion in the Superior Court asking for a hearing and a voir dire of the jurors on the issue of whether outside influences had possibly influenced the jury verdict. He attached three affidavits to the motion. The first was by Carol Melony, Lovett's sister. In her affidavit she alleged that a "Mr. Williams" of Bridgeville, Delaware, had told her that one of the jurors "said that he felt that Jackie Lovett was framed and that the jurors were pressured into making their decision." She admitted in the affidavit that Williams did not specify the source of the pressure. The second affidavit was signed by Jack Melony, Carol Melony's husband. Jack Melony alleged that he had learned that Williams possessed information relevant to the case, that he had asked Williams to come forward with that information, and that Williams refused, saying he did not want to get involved in the case. The third affidavit was by Michael F. McGroerty, a Georgetown attorney, and concerned an incident in a coffee shop near the Court House on an unspecified date. McGroerty's affidavit alleged that

McGroerty was present in the coffee shop on more than one occasion when jurors in the Lovett trial were also present. He stated that "on one occasion when the jurors were present in the coffee shop a woman was speaking in agitated tones in a very loud voice and in fact arguing about the case," speaking specifically about the prosecutor. He also alleged that "other people made comments in the coffee shop in the presence of the jurors which could easily have been overheard by the jurors concerning the case." At a hearing on the motion before the Trial Judge, it was revealed that McGroerty did not have personal knowledge that the conversants he had overheard were actually jurors in the case, and that he did not know the exact content of the conversations. After oral argument, the Superior Court denied the motion. On appeal Lovett contends, without specifying the grounds, that this denial constitutes reversible error.

 Juror bias will not be tolerated in our judicial system. If only one juror is improperly influenced, a defendant in a criminal case is denied his Sixth Amendment right to an impartial jury. *Styler v. State,* Del.Supr., 417 A.2d 948, 951–952 (1980). However, post-verdict questioning of jurors is sparingly employed because of the potential for harassment and intimidation. *Burke v. State,* Del.Supr., 484 A.2d 490, 500 (1984); *See also Styler,* 417 A.2d at 952. D.R.E. 606(b) prohibits inquiry into jury deliberations except where a juror is exposed to prejudicial information or improper outside influence. *Burke,* 484 A.2d at 500. It does not permit inquiry into a juror's mental processes. *Id.* The Trial Judge has very broad discretion in deciding whether a case must be retried or the jurors summoned and investigated due to alleged exposure to prejudicial information or improper outside influence. *Styler,* 417 A.2d at 953. Potentially suspicious circumstances do not justify such inquiry. *United States v. Barber,* 4th Cir., 668 F.2d 778, 787 *cert. denied* 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982). Something

more than unverified conjecture must be shown. *Id.*

 Here the third-hand allegations that one juror felt "pressure" do not rise to the level of exposure to prejudicial information or improper outside influence. It amounts only to conjecture that such "pressure" was actually felt or came from an improper source. The allegation that the jury might have participated in or been exposed to a discussion concerning the case outside of the courtroom also presents at most a potentially suspicious circumstance. The mere possibility that members of the jury heard spectators' arguments and comments about the case, or even that they participated in "loose talk" outside of the courtroom, raises only the barest speculation that the jury reached its verdict on the basis of something other than the evidence presented at trial. Such speculation does not justify a new trial or an inquiry into the jury's verdict. *Styler,* 417 A.2d at 952–953. In any event, the Trial Judge occupies a unique vantage point in assessing the merit of a claim of juror misconduct and his determination will not be disturbed absent an abuse of discretion. We find no such abuse here.

### VIII

 Before trial of this case, defense counsel moved for jury bifurcation on the ground that a death qualified jury selected under the standards announced in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) is unconstitutionally conviction prone. At a hearing on this motion, the State and the defense stipulated that the motion would be controlled by a case then pending appeal in this Court which posed an identical issue. That case has since been decided. *Blount v. State,* Del.Supr., 511 A.2d 1030 (1986). It is now clearly established that the use of a death qualified jury at the guilt-innocence phase of a capital trial does not deny a defendant his right to an impartial jury or to a fair cross section of jurors under the United States or Delaware Constitutions. *Id.* at

1037–1038. Accordingly, Lovett's claim of error in this regard is devoid of merit.

## IX

Finally, it is necessary to consider two subsidiary contentions raised by Lovett. Several days before trial Lovett filed a motion to have his pretrial statements suppressed on the ground that they were the fruit of an illegal arrest, search, and seizure. Specifically, he claimed that the vehicle in which he was riding when arrested was stopped without probable cause or reasonable suspicion. Several days into the trial the trial court disallowed this motion, ruling that it was not timely filed. Lovett seeks to have his convictions reversed due to this disallowance.

■ Super.Cr.Crim.R. 41 governs the timing for filing motions to suppress and it affords the Court some discretion in the disposition of such motions. *State v. Moore*, Del.Super., 187 A.2d 807, 822 (1963). Important policy and practical considerations suggest that hearings on suppression motions be held prior to trial. *See* 3 W. LaFave, *Search and Seizure: A Treatise On The Fourth Amendment*, § 11.1 at 474–478 (1978). If a defendant has been afforded an adequate pretrial hearing, where the admissibility of certain evidence has been argued and ruled on, he should not be permitted to raise, on the eve of trial, new objections to the same evidence based on a significantly different theory. *Id.* at 477.

■ This case had been pending trial for more than two years after indictment. The trial court had conducted a suppression hearing nearly two months in advance of trial specifically to determine the admissibility of Lovett's statements under the Federal and Delaware Constitutions. Lovett's counsel raised no Fourth Amendment claims at that time. Instead, he waited until several days before the trial itself to file a motion based on the Fourth Amendment. Arguments on that motion were not presented until the trial itself had begun. In light of these factors and the relevant policy and practical considerations, the Superior Court did not abuse whatever discretion it has under Rule 41 in ruling Lovett's motion untimely.

■ Moreover, although this Court will generally not pass on the merits of issues not raised and resolved below, Supreme Court Rule 8, it appears from a review of the record that this claim is patently without merit. An officer involved in the stop testified at trial that the vehicle was stopped specifically because police suspected that Lovett, whom the officer knew was wanted for murder, was a passenger in the vehicle. Defense counsel declined even to cross-examine that officer. In light of this uncontroverted testimony and the complete lack of evidence in the record indicating that the stop was illegal, we decline to reverse Lovett's convictions on the basis of the Superior Court's ruling.

■ At trial defense counsel sought to introduce evidence that Megee's notes concerning Lovett's lengthy statement were not produced for the defense until early 1984, to support his argument that Megee fabricated the statement. Lovett contends that the trial court's rejection of such evidence justifies reversal. We disagree. As the trial court noted, this evidence was at best speculative on the issue of fabrication. Defense counsel was permitted to introduce testimony that Megee never mentioned this statement to a prior attorney of Lovett who specifically asked him "to tell me all about the alleged confession." Furthermore, since the responsibility for discovery responses is upon the prosecutor, not the witness, the only reasonable method for the prosecution to rebut the inference of fabrication Lovett sought to create would have been for the prosecutor to testify and explain the late discovery, a practice which is at best frowned upon. D.R. 5–102. In light of these factors, the trial court did not abuse its discretion in excluding such evidence. D.R.E. 403.

This complex murder case was exhaustively tried and subjected to thorough ap-

pellate review. Although the trial in this case was not problem-free, the defendant was not entitled to a perfect trial, but one that was fundamentally fair and free of reversible error. " '[A] defendant is entitled to a fair trial but not a perfect one,' for there are no perfect trials." *Brown v. United States*, 411 U.S. 223, 231–232, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973). We are satisfied that the defendant was accorded a fair trial and since we find no reversible error on any of the grounds advanced in support of this appeal, the judgment of conviction is

AFFIRMED.