IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CALVIN L. USHERY, | § | |
| | § | |
| Defendant Below, | § | No. 422, 2024 |
| Appellant, | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. 2209011148A (N) |
| | § | |
| Appellee. | § | |

Submitted: July 16, 2025
Decided: September 8, 2025

Before **VALIHURA**, **TRAYNOR**, and **GRIFFITHS** Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Anthony Capone, Esquire, Elliot Margules, Esquire (*argued*), OFFICE OF THE PUBLIC DEFENDER, Wilmington, Delaware for Appellant.

Julie Donoghue, Esquire (*argued*), DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

## I. INTRODUCTION

Calvin Ushery was charged with committing an armed robbery of a jewelry store and an assault on its storeowner. On September 15, 2022, a masked assailant entered Solid Gold Jewelers and asked its owner, Chang Yen Suh, to show him what was available for sale. Suh displayed some of his jewelry. The assailant pointed a gun at Suh and assaulted him with the gun and a hammer. The assailant smashed multiple cases and displays, and took jewelry before fleeing the scene. Suh suffered bruises and lacerations on his head, was hospitalized, and underwent extensive rehabilitation for the following eight months.

On November 21, 2022, a Superior Court grand jury indicted Calvin Ushery for Robbery First Degree, Assault First Degree (Over 62 Years), two counts of Possession of a Deadly Weapon During the Commission of a Felony ("PDWDCF"), two counts of Possession of a Deadly Weapon by a Person Prohibited ("PDWBPP"), and Criminal Mischief.[1]

A five-day jury trial began on September 11, 2023, but a hung jury resulted in a mistrial. Following a second jury trial held between April 29, 2024, and May 2, 2024, the jury found Ushery guilty of Robbery First Degree, Assault First Degree (Over 62 Years), and PDWDCF.[2]

---

[1] *Id.* at A1 (Superior Court Docket at D.I. 4), A12–16 (Indictment). The State subsequently dismissed one of the PDWDCF charges.

[2] *Id.* at A9–10 (Superior Court Docket at D.I. 64). On May 1, 2024, the State entered a *nolo prosequi* on the criminal mischief charge and a *nolo prosequi* on the two counts of PDWBPP on May 2, 2024.

On September 3, 2024, the Superior Court granted the State's motion to declare Ushery a habitual offender under 11 *Del. C.* §4214(c). On the same day, Ushery was sentenced as follows: for Assault First Degree - life in prison, suspended after twenty-five years followed by decreasing levels of supervision; for Robbery First Degree - twenty-five years at Level V, suspended after ten years followed by decreasing levels of supervision; and for PDWDCF - twenty-five years at Level V, suspended after five years for two years at Level III.[3] On September 25, 2024, Ushery filed a timely notice of appeal in this Court.

## II. CONTENTIONS ON APPEAL

In this appeal, Ushery first contends that the trial court failed to admonish the jury that pre-deliberation discussions about the case were prohibited and that the court "went as far as telling the jury it was 'not concerned' with exposure to extrajudicial materials."[4] He argues that without an adequate warning, which must be repeated on a daily basis during trial, and given "common sense along with the internet's defining presence in modern society,"[5] this Court should presume that juror misconduct occurred. Second, he argues that after one juror, Juror 15, who was an alternate juror, submitted a note raising three questions, the trial court erred in not conducting a further inquiry of that juror to determine whether that juror had been engaging in extrajudicial research, and whether the juror's hearing issue had been resolved.[6] Ushery contends that as a result of these errors, he

---

[3] Opening Br. Ex. A. All sentences of confinement were ordered to run consecutively.

[4] Opening Br. at 2.

[5] *Id.*

[6] *Id.* Alternates are often needed to replace jurors who must be excused during trial. Otherwise, they are excused when the jury begins deliberations.

3

suffered a violation of his constitutional right to a fair trial to be decided by an impartial jury based only upon the evidence presented in court.

Ushery also asks this Court to adopt a rule that "*if* a trial court fails to admonish a jury to not discuss the case or conduct research, *then* there is a (rebuttable) presumption that the jury will do exactly that."[7] We conclude that the premise of Ushery's request is incorrect. Although the trial court did not admonish the jury every day, it did admonish the jury, and any shortcomings in its instructions did not rise to the level of plain error. We also reject Ushery's assertion that the trial court committed plain error by not excusing Juror 15, or alternatively, by not conducting an inquiry as to whether Juror 15 had conducted extrajudicial research. Accordingly, we AFFIRM the Superior Court's judgment of conviction.

## III. ANALYSIS

### A. Standard of Review

Ushery's claims related to the trial court's instructions and admonishments were not raised during the trial, and therefore, we review his claims for plain error.[8] Under a plain error review, first "the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[9] Second, "the doctrine

---

[7] Opening Br. at 30 (emphasis in original).

[8] *Wright v. State*, 212 A.3d 269, 2019 WL 2417520, at *4 (Del. June 6, 2019) (TABLE) (reviewing for plain error a claim that the trial court erred by failing to give an alibi instruction even though the defendant did not request one); *Gregory v. State*, 293 A.3d 994, 998 (Del. 2023) (citing plain error as the standard of review for untimely objection to jury instructions).

[9] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986), *cert. denied*, 479 U.S. 869 (1986).

4

of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[10]

In addition, "[a] trial judge's decision not to remove a juror for cause is ordinarily entitled to deference."[11] "The deference given to such determinations on appeal is based upon the judge's ability to assess the veracity and credibility of the potential juror."[12] "The question thus presented is one of mixed law and fact . . . . The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest."[13] If the Superior Court fails to sufficiently inquire into juror bias, this Court must independently evaluate the fairness and impartiality of the juror, and the "examination is more analogous to *de novo* review."[14]

### B. The Superior Court Did Not Plainly Err in its Jury Instructions

We begin with some general principles. "Under the Sixth Amendment of the United States Constitution, all defendants have a fundamental right to a fair trial by an impartial

---

[10] *Id.*

[11] *Schwan v. State*, 65 A.3d 582, 590 (Del. 2013).

[12] *Id.* at 589.

[13] *Id.* (quoting *Reynolds v. United States*, 98 U.S. 145, 156 (1878)).

[14] *Id.* at 590 (citing *Knox v. State*, 29 A.3d 217, 221 (Del. 2011)). We observed in *Schwan* that the United States Supreme Court has not established a constitutional test to determine juror partiality. *Id.* at 589. Instead, it has stated that "[i]mpartiality is not a technical conception," rather, "[i]t is a state of mind …. [and] the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." *Id.* (quoting *United States v. Wood*, 299 U.S. 123, 145–46 (1936)).

5

jury."[15] As this Court observed in *Schwan v. State*, "[t]he impartiality of jurors is essential to the proper functioning of the jury."[16] The right to a jury trial by an impartial jury requires that "the jury's verdict be based on evidence received in open court, not from outside sources."[17] The rights of an accused "*can be exercised effectively only if evidence is presented to the jury in the courtroom*."[18] This rule assures the accuracy of the testimony which jurors hear and safeguards the proper admission of other evidence.[19]

We have held that "if only one juror is improperly influenced, a defendant in a criminal case is denied his Sixth Amendment right to an impartial jury."[20] "Juror impartiality must be maintained not only in the interest of fairness to the accused, but also

---

[15] *Id.* at 587; U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."). Because Ushery has not adequately presented his state constitutional claim, we do not consider it. *See Thomas v. State*, 305 A.3d 683, 696–97 (Del. 2023) ("[T]he proper presentation of an alleged violation of the Delaware Constitution should include a discussion and analysis of one or more of the following criteria: textual language, legislative history, pre-existing state law, structural differences, matters of particular state interest or local concern, state traditions, and public attitudes or other applicable criteria.") (quoting *Lloyd v. State*, 292 A.3d 100, n.48 (Del. 2023)).

[16] *Id.*

[17] *Biddle v. State*, 302 A.3d 955, 2023 WL 4876018, at *9 (Del. July 31, 2023) (TABLE) (quoting *Flonnory v. State*, 778 A.2d 1044, 1052–53 (Del. 2001) (internal quotations omitted); *see also Smith v. State*, 317 A.2d 20, 23 (Del. 1974) ("We take occasion to emphasize that fairness, and indeed the integrity of the judicial process, make it imperative that jurors secure information about the case only as a corporate body in the courtroom.").

[18] *Baird v. Owczarek*, 93 A.3d 1222, 1227 (Del. 2014) (emphasis in original). These rights include, for example, the right to confrontation, cross-examination, and the assistance of counsel. *Id.*

[19] *Id.*

[20] *Schwan*, 65 A.3d at 587–88 (quoting *Hall v. State*, 12 A.3d 1123, 1127 (Del. 2010)).

to assure the overall integrity of the judicial process."[21] Society's confidence in our judicial system can be undermined by juror bias, either actual or apparent.[22]

### 1. Ushery's "Daily Admonishment" Claim Fails

We first address Ushery's contention that the trial court's instructions and admonishments were constitutionally deficient and that, as a result, this Court should presume that juror misconduct occurred in this case.

Ushery argued in his opening brief on appeal that "the trial court did not instruct the jury to avoid exposure to extrajudicial information, or discussions of the case; and therefore, there is no basis to presume that they did so."[23] However, that assertion plainly is incorrect as our recitation below demonstrates. Although Ushery appears to retreat from this "no admonishments" position,[24] he still maintains that the Superior Court's admonishments were inadequate, should have been repeated each day, and were partially "undone" by the Superior Court's "not concerned" comment made on the third day of trial. We reject each of these contentions.

The timing and sequence of admonishments and instructions is important in understanding why the factual predicate to Ushery's claim is not accurate. The trial was a

---

[21] *Id*. at 588.

[22] *Id*.

[23] Opening Br. at 7; *see also id*. at 1 ("Moreover, at no point did the trial court admonish the jury not to discuss the case or prohibit them from accessing extrajudicial material.").

[24] In his reply brief, and in addressing this statement in his opening brief, Ushery concedes that "[t]he State is correct that Ushery's description of the record was flawed in this regard . . . ." Reply Br. at 2. On page 13 of his opening brief, he refers to an instruction that was given during the jury selection process but argues that it was confined to that process.

three-and-a-half-day trial beginning on Monday, April 29, 2024, and ending on Thursday, May 2, 2024.

During jury selection on the first day, the Superior Court instructed the jurors not to discuss the case with others and not to access extrajudicial information about the case:

> Each of you is a prospective juror in the case. During the jury selection process, except in response to questions, you may not discuss the case with anyone, including other possible jurors. Nor may you read or listen to any accounts or discussions of the case that may be reported in the news media, social media, on the internet, in the newspaper, or on radio or television.[25]

In furtherance of those instructions and to ascertain potential juror bias, the trial court asked a number of questions during *voir dire*, including the following:

> Do you know anything about this case through personal knowledge, discussion with anyone, the news media, or any other source?[26]
>
> . . . .
>
> Have you seen, read, or heard anything recently in the media, through television, documentary, movies, social media, the Internet, or any other source, that would affect your ability to render a fair and impartial verdict in this case?[27]

After the jury had been selected and at the end of the first day of trial, the Superior Court gave a further "no discussion/no research" instruction as follows:

> THE COURT: All right. *Folks, the only admonition I leave you with is do not discuss the case with your loved ones, don't do any Internet research,*

---

[25] App. to Opening Br. at A19.

[26] *Id.* at A19.

[27] *Id.* at A20, A23. As we explained in *Ortiz v. State*, "[f]or centuries, *voir dire* has been the method used to ascertain the impartiality of a prospective juror. The purpose of *voir dire* is to ensure the selection of qualified jurors, who have no bias or prejudice that would prevent them from returning an impartial verdict based on the law and the evidence that is properly admitted during trial." *Ortiz*, 869 A.2d 285, 291 (Del. 2005), overruled on other grounds, *Rauf v. State*, 145 A.3d 430 (Del. 2016).

*don't do any of the Google, any of that stuff, don't talk to each other about the case until all the evidence has been heard. You're certainly free to tell your loved ones that you're on jury duty, but don't tell them what the case is about.*

*This case may be covered in the press, so I would ask you not to read the, particularly the local press which may have news stories. I tell you, if someone comes in tomorrow and says I read something in the paper, it's going to cause a real problem with the jury. So if you are exposed to something that you shouldn't have known about, let me know and we'll talk about whether you're tainted, but don't taint the whole jury if it happens because that would blow up our efforts here.*

So with that, we will start promptly at 9:30 tomorrow morning. As I said, we'll have a morning break and then a lunch break and then an afternoon break, and we hope to go all the way till 4:30 tomorrow afternoon. With that, thank you, thank you for your service. I'll see you at 9:30 sharp tomorrow.

(Jury leaves the courtroom at 4:20 p.m.)

THE COURT: Okay. 9:30, everyone.

(Court adjourned at 4:20 p.m.)[28]

Ushery contends that the instructions given during jury selection during the beginning of the first day were confined to the jury selection process and that, as a result, the jury likely inferred that these instructions did not apply thereafter.[29] Therefore, he argues that we should assume or adopt a presumption that the jury engaged in extrajudicial research between that instruction and the instruction given at the end of the first day.

---

[28] App. to Opening Br. at A40 (emphasis added).

[29] *See, e.g.*, Opening Br. at 13 ("In this case, the trial court specifically confined the restrictions on discussions and outside research to 'during the selection process;' thereby implying that, *after* the selection process, they were permitted to do so.") (internal citations omitted) (emphasis in original). Ushery acknowledges, however, that before opening statements on the first day, the trial court did inform the jury that they would "*decide the case based upon the evidence presented from the witness stand, or through documentary or other evidence.*" *Id.* at n.12 (quoting App. to Opening Br. at A27) (emphasis added).

His next challenge relates to a juror's note. At the beginning of the second day of trial, and before the jury had entered the courtroom, the trial court informed the parties about a note sent by alternate Juror 15. The court read the note which included the following three questions:

> Question 1: Would it be possible to make sure witnesses talk in the microphone? One of the police officers yesterday was looking at the jury instead of talking into the microphone and I had a little difficulty hearing some of what he was saying. I've got my hearing aids turned up as high as I can bear.
>
> [Question] No. 2: Would it be possible to see a side-by-side comparison to the perpetrator's eyeglasses and the defendant's eyeglasses on the day he was arrested? I'm asking this early in the trial because I realize it may take some time and effort to perform. Also, if the eyeglasses are dissimilar, it might be possible to find out when and where the defendant's eyeglasses were purchased to verify whether the timing was before or after the crime event.
>
> [Question] No. 3: When the victim was saying with a black sundress, I think he may have been referring to a black face mask or a black mask, *etc*. Don't know the victim's ethnicity, but the Asian characters for sundress/dress may be similar to mask/face mask.[30]

Both Ushery and the State requested that Juror 15 be excused for commenting on the evidence, but the trial court denied the parties' request.[31] Defense counsel then pressed for an instruction to make sure that the jurors were not "looking anything up." The following exchange reflects the court's denial of that request for an instruction:

> THE COURT: Jurors are allowed to ask questions. Many, many juries, they're given notebooks and invited to ask questions. I'm not going to strike him just because he has questions. So give me something else. Do you want me to give an instruction to him or somebody else?

---

[30] App. to Opening Br. at A328; *see also* A45-46.

[31] *Id.* at A46–49.

[DEFENSE COUNSEL]: I think it's a valid point that witnesses should be speaking in the microphone. *But other than that, just making sure that they're not talking about anything, they're not looking anything up.*

THE COURT: *There's nothing in here that suggests he's talking to other jurors or looking anything up. If that were true, that would be a problem.*

[DEFENSE COUNSEL]: I understand. I'm just concerned how much he might have done beyond this –

THE COURT: You're worried he's going to become one of the twelve to drive everybody crazy.[32]

. . . .

THE COURT: I don't think that Question 2 or 3 are -- this is this juror just basically just kind of shooting out the juror's questions about the evidence that he's seen. At the end of the day, the evidence is going to be what it's going to be. The jurors are perhaps gun jumping of speculation is not well taken. *But I don't see any reason to instruct on these.*[33]

The Superior Court rejected the request for an instruction because it saw no indication that the jurors had engaged in any inappropriate discussions or extrajudicial research. Defense counsel then raised a concern about the jurors potentially having seen video on the news before trial regarding the robbery. Defense counsel asked the trial court to address this concern:

[DEFENSE COUNSEL]: And then one of my other concerns, regardless of the note, is just a lot of people may not have recognized some of the names, but the video that shows the robbery was on social media and in the news quite a bit. So if Your Honor could just address any concerns with that, just because they may not have known to say yes to one of those questions based on the names. But they may have seen something in the media and the video itself that might have reminded them of anything they read online or anywhere else.

---

[32] *Id.* at A47.

[33] *Id.* at A48 (emphasis added).

11

[STATE]: Your Honor, I would object to that. I think the Court's instructions both in terms of asking them if they know anything about the case and instructing them not [to] do any research has sufficiently covered that. I don't think there should be anything additional to that point.

. . . .

THE COURT: Yeah. And I think in states and jurisdictions where juror questions are more -- are used more often, one of the reasons states are reluctant to allow jurors to fire out questions is that frequently the questions are not germane, they're not relevant, or they reflect the jurors' biases or whatever more than they do the evidence. We just happen to have an active juror here who is offering his own view of how he thinks the case ought to be tried, but it's really not his business.

I will wait until the recess. Your question about the video, I don't know whether it was on the – it was not covered yesterday, was it?

[STATE]: I didn't look, Your Honor. I don't know.[34]

The trial court then indicated that it wanted to think about the video issue and took

defense counsel's request under advisement:

THE COURT: *I guess there's some concern -- let me think about it.* I think if a juror did see the video on the news media, it's just video they saw on the news media. It doesn't necessarily reflect they formed some opinion or would carry that opinion forward to the prejudice of either party. But you're right that it was covered the last time around. And it's at least possible that they know more now than they did yesterday morning to the question. *So let me think about that and I'll try to find some way --*

[DEFENSE COUNSEL]: My concern isn't having seen the video, but there were a lot of comments and some people have remarked on Mr. Ushery as having a record, things like that.

THE COURT: In the media?

[DEFENSE COUNSEL]: Yes.

---

[34] *Id.* at A47–50.

THE COURT: Okay. I never saw any of that, but I trust you. Anything else?[35]

On the next day, the third day of trial, Wednesday, May 1, 2024, the trial court followed up on the concern Ushery's counsel had expressed regarding the possibility that jurors may have seen in the news videos concerning the case. The trial court then addressed this pre-trial publicity concern with counsel before the jurors entered the courtroom and previewed with counsel what it planned to say to the jury:

> THE COURT: And I'll circle back -- I'm not sure, I think [defense counsel] raised the issue about publicity. You made several references in cross-examination to prior testimony, prior hearings, or whatever. I'm not sure if there's any mystery that this is a second trial. I don't know that I'd want to say that, but you're just concerned that pretrial publicity may have infected their objectivity.
>
> [DEFENSE COUNSEL]: Yes, your Honor, just if there could be some sort --
>
> THE COURT: It seems to me that -- so the issue isn't really whether or not they saw a headline or read a story, the issue is whether or not their, whatever they saw or read is going to impact their ability to be fair and impartial?
>
> [DEFENSE COUNSEL]: Right. And I think viewing the video might bring memories back more than just reading names into --
>
> THE COURT: *Well, I think what I'll do is say, look, now that that's out, you might have seen press coverage. If you did and if it affects you, I want to hear about it. If you did and it doesn't affect you, I don't care, it's not relevant.*
>
> [DEFENSE COUNSEL]: Thank you.
>
> THE COURT: Thank you. Bring them in.[36]

---

[35] *Id.* at A50 (emphasis added).

[36] *Id.* at A242 (emphasis added). Thus, the trial court previewed with counsel what its proposed instruction would be and defense counsel, rather than objecting, responded, "Thank you." *Id.*

After thus previewing with counsel what it would say to the jury, the jurors entered the courtroom, and the court gave the following instruction to the jury:

> THE COURT: Second thing is, after seeing the video from the inside of the store, that may have jelled some memories among some of you of having seen that video before or being aware of some publicity about this incident when it happened, or whatever. That does not concern me terribly, we try to get into that during the voir dire that if you know anything about the case, you know, tell us about it. ***Maybe you did see something, I'm not concerned whether you did or not.*** I am concerned, though, whether seeing it now changes your answers to your ability to be fair and impartial and objective and weigh the evidence that you hear in this case. So you don't have to say anything now, but if you're concerned about some pretrial or extrajudicial information may have come in and affected your ability to be fair and impartial, let the bailiff know and we'll talk about it during a recess.
>
> Finally, to my friend Juror No. 15, I hope we've taken case of the -- well, maybe not -- I hope we've taken care of the hearing questions.
>
> JUROR: (Makes thumbs-up gesture.)
>
> THE COURT: Good? You had some other questions that, frankly, are outside the scope of what we can talk about. And no dig on you, I appreciate an inquisitive mind, *but we're stuck with the evidence that we hear in court. Okay?*[37]

We refer to the italicized bold comment above as the "Not Concerned" comment. Ushery contends that whatever salutary effects the trial court's previous no discussions/no research admonitions had, they were "undone" by the trial court's Not Concerned comment made during the third day of trial.

Then, on the last day of trial, Thursday, May 2, 2024, and following the parties' submission of all evidence, the Superior Court instructed the jury again about determining

---

[37] *Id.* at A243 (emphasis added).

14

the facts based only on the evidence presented in court.  In its instructions, the trial court referred to its prior admonishments regarding doing extrajudicial research:

> THE COURT:
>
> . . . .
>
> In connection with your judgment of the facts, it is your duty to determine the facts only from the evidence presented in the case.  Of course, one of the reasons you're here is because of your wisdom and common sense, but it would be unfair for the jury to base its verdict on facts that were not presented or fairly inferred from the evidence.  This is why the [c]ourt has admonished you not to do independent research on any aspect of the case:  as jurors in the case, you assume a unique role as 12 people speaking with one voice.  That one voice must be the voice of 12 people who have all seen and heard the same evidence.[38]

In addition, the trial court prefaced its end-of-trial instructions by reminding the jury that the only information they could consider was the evidence presented by the parties:

> THE COURT:  Folks, I'm going to read these instructions to you, and while I'll do my best to give you the dramatic reading -- you don't need to look it up, just leave it -- there will be written copies for you in the jury room.  So I'll be riveting, but you'll have copies.
>
> Ladies and gentlemen of the jury, the evidence and arguments in this case are now closed.  That means that each side has presented all the evidence that is going to be presented and made all of the arguments that are going to be made.  I tell you this because it is quite common for jurors in the jury room to question why something was not discussed by the parties or what someone said from the stand and for there to be disagreement in the jury room.  You've heard all you're going to hear from the witness stand, no more witnesses will be called, and we will not reconvene so the lawyers or the [c]ourt can explain more or different facts or arguments that have not previously been disclosed.  The parties believe you have all the information you need to render a verdict.[39]

---

[38]  *Id.* at A322.

[39]  *Id.*

The trial court concluded its instructions at 12:25 p.m. on the fourth day of trial. It excused the alternate jurors at that time. Thus, Juror 15 did not participate in the jury's deliberations. The jury re-entered the courtroom at 2:33 p.m. to return its unanimous verdict of guilty as to all three counts. The court adjourned at 2:35 p.m.

We now return to Ushery's first claim of error. Having retreated from his initial position on appeal that the trial court gave no admonishments at all during the trial, Ushery complains of the "gap" between the admonishment that occurred during jury selection and the instruction which was given at the end of that first day. He asserts that we should presume the jury would have understood that the initial instruction in the morning was limited only to the jury selection process, and that because no similar instruction was given after lunch that same day after the jury was sworn and the trial began, this Court should *presume* that the jury conducted extrajudicial research during its lunch break. Yet, Ushery presents this Court with no authority supporting such a presumption and we decline to adopt one based upon the record before us.[40] Instead, Ushery argues that "[i]t is common sense that a juror who is not admonished to avoid extrajudicial information and discussing the case, will likely do both."[41] He also cites "modern cultural and technological realities

---

[40] *See United States v. Richardson*, 817 F.2d 886, 889 (D.C. Cir. 1987) (rejecting the contention that the court's initial instruction given upon empaneling the jury not to discuss the case "either now or later this afternoon or tomorrow, whatever" applied only to the immediate separation of the jury from the courthouse). The court in *Richardson* observed that, ideally, "the trial court should repeat the admonition each time the jury leaves the custody of the marshals." *Id*. However, it also noted that a "failure to do so is not automatically reversible [error]." *Id*. There, the admonition given "was minimally sufficient for a short trial." *Id*.

[41] Opening Br. at 14.

– which are generally known," as factors which likely increase a juror's interest in obtaining extrajudicial information and which justify such a presumption.[42]

Although the trial court should have repeated the admonishment again that first day after lunch upon the start of the trial after the jury was sworn, we decline to hold that the trial court's failure to do so here rises to the level of reversible plain error. The trial court did, before opening arguments, admonish the jury that they must "decide the case based upon the evidence presented from the witness stand, or through documentary or other evidence."[43] On this record, we decline to presume juror misconduct.

Despite our finding of no plain error, and our disinclination to presume prejudice here, we think it is worth amplifying the guidelines we gave to trial judges in *Smith v. State*.[44] There, we suggested the following guidelines in the exercise of the trial judge's discretion:

> In our view, for the integrity of the trial and in the interests of justice, the Trial Judge should, at the end of each day, caution the trial jury collectively about avoiding accounts of the proceeding which may appear in the news media, including newspapers, radio and television. At the commencement of each new trial day the Court should inquire of the jury, collectively, as to whether any member has in any way been exposed to such accounts; when a juror responds affirmatively the Trial Judge should, out of the presence of the remainder of the jury, inquire into the nature and extent of the exposure. Such inquiry should be made by the Court, not counsel, and may be conducted in chambers.[45]

---

[42] *Id.*

[43] App. to Opening Br. at A27.

[44] 317 A.2d 20, 23 (Del. 1974).

[45] *Id.* at 23.

Given that these guidelines were published over half a century ago, we recommend admonishing the jury also about avoiding and accessing more modern technology, including emails, texts, internet-based research, instant messaging apps, and social media platforms (like Facebook, Instagram, LinkedIn, WhatsApp, and Snapchat, for example) concerning the proceeding. In *Baird v. Owczarek*, decided forty years after *Smith*, we addressed a more modern version of the guidelines issued in *Smith*. There, one juror advised the trial judge, after the trial had concluded, that another juror (No. 9) had done internet research during the jury's deliberations. We held that where a juror "makes allegations that one or more jurors violated a direct instruction of the trial judge to refrain from conducting internet research, such allegations represent an egregious circumstance giving rise to a rebuttable presumption of prejudice from exposure to an improper extrinsic influence."[46] Accordingly, the trial judge's failure to conduct *any* investigation was an abuse of discretion and reversible error.[47]

We observed in *Baird* that the Superior Court had clearly and appropriately instructed the jury that they were not to:

> use any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, Blackberry, computer; the Internet, any Internet service, or any text or instant messaging service; or Internet chat room, blog, or website such as Facebook, My Space, LinkedIN [sic], YouTube or Twitter to

---

[46] *Baird*, 93 A.3d at 1230.

[47] *Id*. at 1231 (emphasis in original).

18

communicate to anyone any information in this case or conduct any research about this case until I accept your verdict.[48]

We agree with Ushery that the rapidly advancing communications technology requires trial courts to ensure that jurors understand their obligations to base their decisions only upon evidence properly present in court.[49] The court should instruct the jurors that they may not investigate matters pertaining to the case. The instructions given should include instructions to refrain from communicating about the case outside the jury room until the case is over, including through the use of electronic devices, social media, instant messaging applications and the like, as in *Baird*.[50] But the instructions given here on the

---

[48] *Id.* at 1228. We hesitate to mandate any particular language given the rapidity with which technology has been developing. Instead, the Superior Court periodically should examine its instructions as necessary.

[49] *See, e.g.*, *United States v. Fumo*, 655 F.3d 288, 331 (3d Cir. 2011) (Nygaard, J., concurring in part) ("The days of simply instructing a jury to avoid reading the newspaper or watching television are over. Courts must be more aggressive in enforcing their admonitions.").

[50] Many jurisdictions have developed model jury instructions to address prohibitions on jurors conducting extrajudicial research and using electronic devices to communicate about the case. Such instruction typically prohibits using the internet and electronic devices during trials, and include prohibitions using web search engines, social media, any media accounts via newspapers, broadcasts or digital platforms to access information about the case. *See, e.g.*, *United States v. Ganias*, 755 F.3d 125, 132 (2d Cir. 2014) (noting that "the Third Circuit has endorsed the use of jury instructions like those proposed by the Judicial Conference Committee on Court Administration and Case Management," and that "[w]e do so as well."); *see also Fumo*, 655 F.3d at 305, *as amended* (Sept. 15, 2011) ("enthusiastically" endorsing the *Proposed Model Jury Instructions: The Use of Electronic Technology to Conduct Research on or Communicate about a Case* and encouraging district courts "to routinely incorporate them or similar language into their own instructions"); Judicial Conference Comm. on Court Admin. & Case Mgmt., *Proposed Model Jury Instructions: The Use of Electronic Technology to Conduct Research on or Communicate about a Case* (December 2009), available at www.uscourts.gov/uscourts/New/2010/docs/DIR10-018-Attachment.pdf.; *see also Proposed Model Jury Instructions: The Use of Electronic Technology to Learn or Communicate about a Case*, Judicial Conference Comm. on Court Admin. & Case Mgmt., (updated June 2020), available at https://www.uscourts.gov/sites/default/files/proposed_model_jury_instructions.pdf.; Am. Bar Ass'n, *Principles for Juries and Jury Trials* (2023),

19

first day were at least sufficient to avoid a finding of plain error, and based upon the record, we will not infer that juror misconduct occurred between the *voir dire* and the end of the first day.

Relatedly, Ushery argues that the Superior Court's failure to admonish the jury every day was reversible error. However, in *Smith*, this Court held that "failure to admonish the jury on a daily basis is not reversible error."[51] Although we have suggested the guidelines set forth above, we also note that the guidelines are *not* mandates that would support a reversible error *per se*.[52] Instead, we reaffirm the principle that "the conduct of a trial is largely within the discretion of the Trial Judge."[53]

During jury selection, after the first day of trial, and before the jury's deliberations began, the jurors received instructions to avoid exposure to extrajudicial information and discussion about the case. Juries are presumed to follow the trial judge's instructions.[54]

---

https://www.americanbar.org/content/dam/aba/administrative/american_jury/principles-juries-jury-trial.pdf.

[51] *Smith*, 317 A.2d at 23.

[52] *Smith*, 317 A.2d at n.2A ("Guidelines, as here stated, are not to be considered mandates such as would support assertion of reversible error Per se.").

[53] *Id.* at 23. Jurors also typically receive instructions against accessing extrajudicial information and engaging in pre-deliberation discussions in the Juror Handbook they are given before the trial. In Delaware, the trial court is entitled to assume that the jurors will follow these instructions. *See Smith*, 317 A.2d at 23; *White v. State*, 404 A.2d 137, 140 (Del. 1979). Here, although it is the practice to give jurors the Juror Handbook, no record exists that the jurors were actually given a Handbook for Jurors. In any event, our disposition of this appeal is not dependent upon whether or not they received the Juror Handbook.

[54] *Johnson v. State*, 983 A.2d 904, 935 (Del. 2009).

Ushery offers no evidence that the jurors did in fact engage in extrajudicial research.[55] Based upon the record before us, Ushery's claim of plain error fails.

### 2. Ushery's "Not Concerned" Claim of Error Fails

Ushery next argues that the trial court's Not Concerned comment made on the third day of trial essentially counteracted the previous admonishments during jury selection and at the end of the first day in a way that gave the jury *permission* to conduct outside research. We reject this contention because we think that in making this argument, Ushery has taken the Superior Court's comments out of context.

As detailed above, the trial court's Not Concerned comment was made in response to defense counsel's expressed concern about certain pretrial publicity, namely, a video concerning the robbery. Defense counsel sought a jury instruction because he believed that the jury's possible exposure to the video may have affected their objectivity. The court remarked that if the jurors had seen the video on the news, it did not "necessarily reflect they formed some opinion or would carry that opinion forward to the prejudice of either party."[56]

---

[55] *See, e.g.*, *Commonwealth v. Brown*, 92 N.E.3d 1189, 1200 (Mass. 2018) (rejecting challenge to adequacy of jury instructions where there was a failure to instruct specifically on Internet research because the court's instruction forbade outside research generally and because there was no evidence that any jurors had conducted such research).

[56] *Id.* at A50.

Ushery responded that his "concern isn't [the jurors] having seen the video, but there were a lot of comments and some people have remarked on Mr. Ushery as having a record, things like that."[57] The trial court took the matter under advisement.

In responding to Ushery's concern after having considered the matter, the court instructed the jury, focusing on the jury's duty to be fair and impartial:

> THE COURT: Second thing is, after seeing the video from the inside of the store, that may have jelled some memories among some of you of having seen that video before or being aware of some publicity about this incident when it happened, or whatever. That does not concern me terribly, we try to get into that during the *voir dire* that if you know anything about the case, you know, tell us about it. ***Maybe you did see something, I'm not concerned whether you did or not. I am concerned, though, whether seeing it now changes your answers to your ability to be fair and impartial and objective and weigh the evidence that you hear in this case.*** So you don't have to say anything now, ***but if you're concerned about some pretrial or extrajudicial information may have come in and affected your ability to be fair and impartial, let the bailiff know and we'll talk about it during a recess***.
>
> . . . .
>
> THE COURT: Good? You had some other questions that, frankly, are outside the scope of what we can talk about. And no dig on you, I appreciate an inquisitive mind, ***but we're stuck with the evidence that we hear in court. Okay?***[58]

Although Ushery argues that the trial court telling the jury it was "not concerned" about whether they had seen extrajudicial information affirmatively *encouraged* juror misconduct in the form of extrajudicial research, we disagree. In examining this statement in the context of the trial court's overall comments, we are convinced that reasonable jurors would not have concluded that they were being encouraged by the court to conduct

---

[57] *Id*.

[58] *Id.* at A243 (italics and emphasis added).

extrajudicial research. Ushery ignores that the trial court's focus in making the comments was on whether the jury had been exposed to pre-trial publicity in the form of a video. When the court stated, "maybe you did see something," the "something" referred back to the previous sentence's reference to pretrial publicity and videos. The "not concerned" statement follows that statement. Then, the next sentence expresses the court's concern as to "whether seeing it now changes your answers to your ability to be fair and impartial and objective and weigh the evidence that you hear in this case."[59] Thus, the court was not saying, as a general matter, that it was not concerned about the jury engaging in extrajudicial research. Rather, the trial court's focus was on maintaining juror impartiality and whether jurors had acquired knowledge of facts that would impair their ability to be fair and impartial.[60]

> Ushery's counsel's responses during this colloquy align with our interpretation:
>
> THE COURT: It seems to me that -- so the issue isn't really whether or not they saw a headline or read a story, the issue is whether or not their, whatever they saw or read is going to impact their ability to be fair and impartial?
>
> [DEFENSE COUNSEL]: Right.[61]

---

[59] *Id.*

[60] *See, e.g.*, *Parson v. State*, 275 A.2d 777, 782 (Del. 1971) ("The question is whether or not, irrespective of a prior opinion, the prospective juror can follow the instructions given by the trial judge, disregarding his prior opinion and deciding the issue of guilt or innocence upon the facts presented in the trial at bar."); *Hughes v. State*, 490 A.2d 1034, 1040 (Del. 1985) (describing the issue as "whether the knowledge of these inadmissible facts was so prejudicial as to actually indicate juror bias or raise a presumption that the jury was biased," and finding that the jurors' "knowledge was so significant in this case that it does raise a presumption of bias which infringed on defendant's Sixth Amendment right to a fair trial."); *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) ("Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense.").

[61] App. to Opening Br. at A242.

Ushery also contends that the trial court's subsequent statement that the jury was "stuck with the evidence that we hear in court" was problematic because instead of explaining the rationale for the rule that facts must be determined based only upon evidence presented in court, the court presented that rule as being unfortunate. Indeed, it might have been preferable if the court had phrased the point differently.[62] But we see the gist of the court's comment as discouraging extrajudicial research rather than encouraging it. Moreover, there was no evidence that any juror was aware of such pretrial publicity, and no juror indicated that he or she could no longer be fair and impartial. Accordingly, we find no plain error.

### 3. The Superior Court Did Not Err in Declining to Conduct Additional Voir Dire on Juror 15 or in Failing to Remove Juror 15

Ushery next argues that Juror 15's note supports an inference of juror misconduct that required an inquiry by the trial court and that the court's failure to make such an inquiry merits reversal. Specifically, Ushery argues that Juror 15's second and third questions support the inference that Juror 15 accessed extrajudicial information. He points out that both Ushery and the State requested that Juror 15 be removed. He contends that the note required an inquiry, if not excusal, of Juror 15.

This Court has held that a trial court's refusal to remove a juror for cause is entitled to deference, but if the trial court fails to sufficiently inquire into juror bias, then this Court

---

[62] When instructing the jury, we suggest avoiding colloquialisms, slang, or other less formal phraseology which could be misinterpreted by the jurors.

is "required to independently evaluate the fairness and impartiality of the juror."[63]  Here, the trial court commented on the record that Juror 15's questions did not reflect or reveal any improper access to extrajudicial information or any improper communications about the case.[64]

At oral argument, Ushery's counsel acknowledged that there was no direct evidence of any juror doing extrajudicial research.  Rather, he argues that we should infer that is the case from the questions posed by Juror 15.  Unlike the cases Ushery cites in support of removing a juror because of potential juror bias,[65] Ushery's claim that Juror 15's questions reflected bias and warranted an investigation by the trial court is supported by the questions being "*extremely* peculiar"[66] and unverified conjecture.  As the trial court reasoned, questions 2 and 3 reflect that juror's speculation regarding the evidence presented and do not suggest that Juror 15 engaged in extrajudicial research.[67]  Moreover,

---

[63]  *Schwan*, 65 A.3d at 590.

[64]  App. to Opening Br. at A47 ("There's nothing in here that suggests he's talking to other jurors or looking anything up. If that were true, that would be a problem.").

[65]  In *Biddle*, a juror (No. 1) believed that she recognized the defendant in a photograph presented by the defense.  *Biddle*, 2023 WL 4876018, at *4.  One juror alleged that Juror No. 1 had conducted internet research.  Juror No. 1 had explained to the court that she had done independent research at home.  We held that "Juror No. 1's independent investigation into the name of the person she believed resembled the person in the video screenshot constitutes conduct that is presumptively prejudicial because she based her concern about the identity of one of the perpetrators, at least in part, on information from an outside source." *Id*. at *9.  In *Schwan*, the juror had a connection with a non-trial prosecutor that was not disclosed during the *voir dire*.  *Schwan*, 65 A.3d at 586.  Because the juror in *Schwan* was never asked whether she could render a fair and impartial verdict, notwithstanding her ongoing business relationship with the non-trial prosecutor, we found the trial judge's examination to be incomplete.  *Id.* at 592–93.

[66]  Opening Br. at 24 (emphasis in original).

[67]  App. to Opening Br. at A48 ("[T]his is this juror just basically just kind of shooting out the juror's questions about the evidence that he's seen.").  By contrast, we said in *Baird* that "once the

"[p]otentially suspicious circumstances do not justify such inquiry," and "[s]omething more than unverified conjecture must be shown."[68] The trial court's reluctance to draw such an inference is not plain error. As we recognized in *Lovett v. State*,[69] "the Trial Judge occupies a unique vantage point in assessing the merit of a claim of juror misconduct and his determination will not be disturbed absent an abuse of discretion."[70] We find none here.

### 4. The Superior Court Did Not Plainly Err by Failing to Address Juror 15's Hearing Issue

Lastly, Ushery argues that Juror 15's first question in the note revealed significant hearing challenges that left doubt about whether Juror 15 had heard the *voir dire* questions and instructions. This issue was not raised below and so we review it for plain error.

At the beginning of the second day of trial and before the jury entered the courtroom, the trial court informed the parties about Juror 15's note. Question 1 of the note asked the court to ensure that witnesses spoke into the microphone. That same day, after the lunch break and before the jury entered the courtroom, the bailiff responded to a question from the court about a technology issue, presumably dealing with Juror 15:

> THE COURT: Do you know if those things are working on in [sic] the other seats?

---

trial court has been presented with evidence of internet research by a juror it is incumbent on the trial judge to conduct an investigation." *Baird*, 93 A.3d at 1230.

[68] *Lovett v. State*, 516 A.2d 455, 475 (Del. 1986), *cert. denied*, 481 U.S. 1018 (1987).

[69] 516 A.2d 455 (Del. 1986).

[70] *Id*. at 475. As an alternate, Juror 15 was excused before deliberations began.

THE BAILIFF: The way they explained it to me, Your Honor, was it's on and there's a button for frequency that they'll be able to know by hitting the button. So I was going to explain it to the juror.[71]

After the jury entered the courtroom, the court addressed Juror 15:

THE COURT: Juror No. 15, we're trying to help out your hearing. Do those things work?

JUROR NO. 15: Don't seem working.

THE COURT: This is the corrosive effect of new technology. It only works when it decides to work.

(Pause.)

THE COURT: Better? Worse? No effect at all? They're actually earmuffs. Some day [sic] we'll get that fixed. Maybe it's the air-conditioning, maybe that's the problem.[72]

Following this exchange, no further issues were raised. The logical inference is that subsequent witnesses spoke into the microphone and that the issues had been resolved.

On the third day of trial, the following exchange between the court and Juror 15 reflects that the hearing issue had been addressed successfully:

THE COURT: Finally, to my friend Juror No. 15, I hope we've taken care of the -- well, maybe not -- I hope we've taken care of the hearing questions.

JUROR: (makes thumbs-up gesture).[73]

Based upon the record before us, the trial court did not abuse its discretion or commit plain error in not removing Juror 15.

---

[71] App. to Opening Br. at A181.

[72] *Id.* at A186.

[73] *Id.* at A243.

## IV.    CONCLUSION

For the reasons discussed above, we AFFIRM the Superior Court's judgment of conviction.